Michael O'DONNELL,
Appellant, (Plaintiff),

v.

CITY OF CASPER, a municipal
corporation; et al., Appellees
(Defendants).

No. 83–107.

Supreme Court of Wyoming.

March 18, 1985.

W.W. Reeves and John C. Brooks of Vlastos, Reeves, Murdock & Brooks, Casper, for appellant.

Richard L. Williams and Frank D. Neville of Williams, Porter, Day & Neville, P.C., Casper, for appellee City of Casper.

Michael J. Sullivan and J. Kenneth Barbe of Brown, Drew, Apostolos, Massey & Sullivan, Casper, for appellees Suzuki Motor Co., Ltd. and U.S. Suzuki Motor Corp.

Before THOMAS, C.J., ROSE, ROONEY and BROWN, JJ., and RAPER, J. (Retired).

BROWN, Justice.

Appellant was seriously injured in a motorcycle accident in Casper, Wyoming. In a lawsuit that followed appellant asserted that the City of Casper was negligent in the maintenance of its streets, and that Suzuki Motor Company had negligently designed the motorcycle involved and was also liable on the theory of strict liability. The trial court granted a summary judgment in favor of appellees.

We will reverse.

The issues are:

1. "Whether the district court erred in concluding that Casper was not negligent as a matter of law.

2. "Whether the district court erred in concluding that Suzuki Motor Company, Ltd. and U.S. Suzuki Motor Corporation were not negligent as a matter of law.

3. "Whether the district court erred in failing to apply the strict products liability standard set forth in § 402A of the Restatement of Torts to the plaintiff's claim against defendants Suzuki Motor Company, Ltd. and U.S. Suzuki Motor Corporation."

On July 8, 1977, appellant Michael O'Donnell was driving Darryl Davis' motorcycle, with permission, on Mariposa Boulevard in Casper, Wyoming. Appellee, City of Casper, had resurfaced Mariposa Boulevard about a month before, and gravel left over from the project remained on the street.[1] As a result of vehicular travel on Mariposa, ridges and piles of gravel accumulated. As appellant proceeded along the boulevard about five to ten miles per hour, Donald Walford suddenly pulled his automobile from a parking place on the street and into the path of appellant. In order to avoid hitting the Walford vehicle appellant veered to the left, and then had to correct back to the right to avoid hitting vehicles parked on the other side of the street. In making those two quick manuevers appellant rode into loose gravel which caused him to "fishtail" and run into a larger

accumulation of gravel. Appellant felt his choices were to lay the motorcycle down, or run into a parked automobile on the opposite side of the gravel. He chose the latter alternative. After hitting the parked vehicle appellant rolled across its hood, falling to the ground, and was engulfed in flames.

Suit was brought against appellee City of Casper (City hereinafter) for negligent failure to maintain its streets. Suit was also filed against appellees Suzuki Motor Company, Ltd. and U.S. Suzuki Motor Corporation (Suzuki hereinafter) for breach of warranty and strict liability in the design, manufacture and sale of its motorcycles. Later, negligent design of the motorcycle was added as an issue.

 We have established certain basic principles that are applicable in reviewing the propriety of granting a summary judgment. Summary judgment is a drastic remedy that is not frequently granted, and as a general rule is not appropriate in negligence actions. *Keller v. Anderson*, Wyo., 554 P.2d 1253 (1976). When a summary judgment is granted by the trial court we must review the entire record in order to determine whether summary judgment was proper. *Wyoming Insurance Department v. Sierra Life Insurance Company*, Wyo., 599 P.2d 1360 (1979). This court has the same duty as the trial court; assuming the record is complete, we have the same material before us as the trial court. *Seay v. Vialpando*, Wyo., 567 P.2d 285 (1977); and *Minnehome Financial Company v. Pauli*, Wyo., 565 P.2d 835 (1977).

 An appellee has a heavy burden in defending a summary judgment because appellate courts must look at the record from the viewpoint most favorable to the party opposing the motion, giving him all favorable inferences to be drawn from the facts contained in affidavits, exhibits, depositions and testimony. *Dubus v. Dresser Industries*, Wyo., 649 P.2d 198 (1982); and

1. Some loose gravel is purposely left on the road in a resurfacing project. The gravel is worked into the seal coat by vehicular traffic.

*Bancroft v. Jagusch*, Wyo., 611 P.2d 819 (1980). Summary judgment is proper only when it is clear that no issue of material fact is involved and inquiry into the facts is not desirable to clarify application of law. *Stephens v. Sheridan Public Employees Federal Credit Union*, Wyo., 594 P.2d 473 (1979). See also Rule 56, Wyoming Rules of Civil Procedure. Furthermore, the party seeking the summary judgment has the burden of demonstrating that there is no genuine issue of material fact, and as a matter of law the movant is entitled to judgment. *Gilliland v. Steinhoefel*, Wyo., 521 P.2d 1350 (1974).

## I

■ A municipal corporation in Wyoming owes a duty to the traveling public to keep its streets and sidewalks in a reasonable safe condition and in reasonably good repair. *Bieber v. City of Newcastle*, 242 F.Supp. 457 (D.Wyo.1965).

> " * * * The most generally accepted rule in this country is that municipalities, which have full and complete control over the streets within their corporate limits * *. * are liable for damages for injuries sustained in consequence of their failure to use reasonable care in keeping them in a reasonably safe condition for public travel * * *." *Opitz v. Town of City of Newcastle*, 35 Wyo. 358, 362, 249 P. 799, 800 (1926).

The trial court in the case before us was of the opinion that the City had no duty to the traveling public if the dangerous condition of the street was known and obvious. The court, referring to the obvious danger rule, said:

> " * * * [W]henever the danger is obvious or at least as well known to the plaintiff as the defendant, there is no duty to remove the danger or warn of its existence."

We will address three reasons why the rule announced by the trial court is inappropriate: 1) cases previously decided by this court can be distinguished from the case before us; 2) the rule was developed before comparative negligence was adopted in Wyoming; and 3) the rule recited in prior cases was overbroad and not dispositive of those cases.

The history of the obvious danger rule in Wyoming reveals that its nature is unclear and its application inconsistent.[2] In one context the obvious danger rule has had the effect of negating any duty owed by a defendant. In another context the rule is a species of contributory negligence or assumption of risk.

A majority of earlier cases discuss the obvious danger rule, treating it as a factor in determining whether the plaintiff was contributorily negligent or had assumed the risk of the danger. *Loney v. Laramie Auto Co.*, 36 Wyo. 339, 255 P. 350 (1927); *Chicago and Northwestern Ry. Co. v. Ott*, 33 Wyo. 200, 237 P. 238 (1925); *In Carney Coal Co. v. Benedict*, 22 Wyo. 362, 140 P. 1013 (1914). In 1966, in the context of when a directed verdict would be upheld, we determined that a defendant's duty could be negated by an obvious danger. *McKee v. Pacific Power and Light Company*, Wyo., 417 P.2d 426 (1966). In two later cases we said that an obvious danger is a factor to be considered in determining contributory negligence. *Continental Motors Corporation v. Joly*, Wyo., 483 P.2d 244 (1971); and *Berry v. Iowa Mid-West Land and Livestock Company*, Wyo., 424 P.2d 409 (1967).

Before the advent of comparative negligence it did not make any difference whether an obvious danger was viewed as negating a defendant's duty, or whether it constituted contributory negligence or assumption of risk. The result was the same; contributory negligence or assumption of risk barred a plaintiff's recovery.

Since comparative negligence was adopted it makes a great difference how an obvious danger is viewed. If an obvious danger negates a duty, a defendant cannot be negligent. On the other hand, if a duty

---

**2.** See *Assumption of Risk and the Obvious Danger Rule, 18 Land & Water Law Review, 374* (1983), for an informative article tracing the history of the obvious danger rule.

is not negated, then the obvious danger is a factor to be considered by the trier of fact in comparing plaintiff's and defendant's negligence. This court has not been consistent in its application of the obvious danger rule since comparative negligence.[3]

In *Bluejacket v. Carney,* Wyo., 550 P.2d 494 (1976), plaintiff was a guest at defendant's resort cabin. Plaintiff knew that the path there was icy, unlit, and rough, but used it anyway, and fell down. Plaintiff brought suit for damages for his injuries against the owner. Summary judgment for defendant was affirmed. The court found that the obvious danger rule relieved defendant of a duty to remove the ice and snow from the path. Justice Rose in his dissenting opinion observed that the obvious danger rule was not always an absolute bar to plaintiff's recovery, and should be a factor in determining plaintiff's percent of negligence.

In *Brittain v. Booth,* Wyo., 601 P.2d 532 (1979), plaintiff was injured when the sides of an excavation in which he was working fell on him. The majority held that plaintiff assumed the risk of such accidents, and reasoned that since under comparative negligence, plaintiff's assumption of risk is to be compared to defendant's negligence, the jury verdict must stand finding plaintiff contributorily negligent. The court acknowledged that the pit was obviously dangerous because the sides were neither shored nor sloped, and thus likely to cave in. The obvious danger rule, however, was not invoked to remove defendant's duty. Rather, the obviousness went to the question of plaintiff's contributory negligence. Justice Rose dissented, but he, too, consistent with his position in Bluejacket, would have evaluated plaintiff's behavior in light of the nature of the condition. The entire court thus treated the obvious danger rule as an expression of contributory negligence rather than negation of duty.

We have never come to grips with the impact of comparative negligence on the

obvious danger rule. We have not made it clear whether the obvious danger rule negates a duty of the defendant or whether the plaintiff assumes the risk of a known and obvious danger. If the plaintiff assumes the risk, then the obvious danger rule is a form of contributory negligence which should be compared with the defendant's negligence by the trier of fact.

The obvious danger rule announced by the trial court, which was dispositive of the case against the City, was reiterated recently in *Sherman v. Platte County,* Wyo., 642 P.2d 787, 789 (1982):

" * * * *First* there is a rule that no duty exists which requires either the removal of an obvious danger or a warning of its existence. *Second* is the rule that no duty exists to remove the natural accumulation of snow and ice. * * *" (Emphasis added.)

In support of these two rules we cited *Johnson v. Hawkins,* Wyo., 622 P.2d 941 (1981); *Bluejacket v. Carney,* supra, and earlier cases. See also, *Norman v. City of Gillette,* Wyo., 658 P.2d 697 (1983). It is noted, however, that although the first rule was recited in *Sherman, Johnson* and *Bluejacket,* they were decided on the second rule. Therefore, the first rule was not the law of the case in those decisions.

■ *Sherman* and the cases just mentioned involved slip and fall situations resulting from a natural accumulation of ice and snow. In *Sherman* we said the known and obvious danger rule applied because there was no duty to remove the natural accumulation of ice and snow. The trial court in the case before us extended the rule of the slip and fall cases beyond a hazardous condition resulting from natural causes to a situation where the known and obvious danger was created in the first instance by the City. Although we have said that a city does not have a duty to correct an obvious and known danger resulting from natural causes, we have never said that a city does not have a duty to

---

**3.** Section 1–1–109, W.S.1977 (comparative negligence), originally enacted as Ch. 28, § 1, S.L. of

Wyoming, 1973.

correct an obvious danger of its own making. The City had a duty to maintain the streets. A rule of law which provides that one who creates a known and obvious danger has no duty to correct it because it is known and obvious is not rational.

An extension of that idea would be that the greater and more obvious the danger, the lesser the duty on the part of those otherwise responsible. Such a rule would not discourage a city from creating or allowing the continued existence of a great and obvious danger. It is not logical to hold that if the city digs an immense hole in the road that can be seen a block away, that its duty to keep the roads safe vanishes. On the other hand, if the city digs a small hole not easy to see, its duty remains. In other words, the bigger the hole the lesser the duty. This is not the intent of the known and obvious danger rule.

The obvious danger rule, precluding recovery, has been narrowly limited. In *Cervelli v. Graves*, Wyo., 661 P.2d 1032, 1039 (1983), the trial court instructed the jury, " 'There is no liability for injuries from dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to any other parties.' " We held that this statement was erroneous.

"The instruction is basically the type of instruction given in a slip and fall case dealing with the known and obvious danger of natural accumulation of ice and snow. We have, on numerous occasions upheld the known and obvious danger rule in appropriate slip and fall cases. [Citations.] Those cases (slip and fall cases) all dealt with suits brought by the injured party against the owner of the premises where the fall occurred. The thrust of our known and obvious danger rule decisions has been that the danger presented by the accumulations of snow and ice does not generally create liability for a possessor of property because of their natural character. We have never, however, applied that rule to an automobile collision case where the parties involved were not in control of the premises where the accident occurred.

"Here the trial court incorrectly applied the known and obvious danger rule to a negligence action between two drivers on an icy highway. The rule does not apply in such a case. To apply such a rule to the case at bar abrogates Wyoming's comparative negligence statute. * * * " Id., at 1039.

According to *Cervelli* the known and obvious danger rule is not applicable in all negligence cases, or even all ice and snow cases. *Cervelli* does not preclude other negligence cases from being exempt from the obvious danger rule.

The rationale of *Cervelli* is applicable here. In the slip and fall cases the danger presented by the accumulation of ice and snow does not generally create liability for the possessor of property. This is because the accumulation is natural. Here, however, the accumulation of gravel on the road was not natural, but was placed there and allowed to accumulate into ridges and piles by the City.

The broad rule derived from *Sherman* and the cases cited therein and used by the trial court [4] to decide this case was adopted by this court before the advent of the comparative negligence statute. Some of the language employed before comparative negligence has spilled over into cases decided by this court after comparative negligence was adopted. The rule cited by the trial court in this case was compatible with the pre-comparative negligence doctrine that contributory negligence was a complete bar to recovery. An inflexible rule that a known and obvious danger is an absolute bar to recovery is not compatible with the doctrine of comparative negligence.

▌ The City may have been negligent by not properly maintaining the streets, and the negligence of the City, if any, should be compared with the negligence of appellant. Because appellant knew of the

---

**4.** Whenever the danger is obvious or, at least as well known to the plaintiff as the defendant, there is no duty to remove the danger or warn of its existence. *Sherman v. Platte County*, Wyo., 642 P.2d 787 (1982).

obviously dangerous condition of the road he may very well have been negligent, but that is for the trier of fact to determine, and the relative degree of negligence is all important under comparative negligence. Gone are the days when a scintilla of negligence by the plaintiff will bar recovery.

The trier of fact, in considering the negligence of plaintiff, may properly consider the known and obvious danger of the street in determining the percent of plaintiff's negligence. However, the known and obvious danger does not result in the disappearance of the City's duty or automatically absolve it from any liability.

The City points out in detail appellant's own negligence and that the condition of the road was known to him. It may be that upon trial the trier of fact will find appellant's negligence equal to or exceeded by that of the City. However, appellant has the right to submit the issue of negligence to the trier of fact and have his negligence compared to that of the City.

We hold that the known and obvious danger rule does not negate the City's duty to keep its streets and sidewalks in a reasonably safe condition and in reasonably good repair, and that the obvious danger of the streets may be considered by the trier of fact to determine plaintiff's percentage of negligence.

■ We believe there was a genuine issue of material fact created on the question of the condition of the streets at the time and place of the accident. In his deposition appellant testified:

"A I was having a very difficult time controlling the bike in the very deep gravel between the two streets here. I had—I could not turn the bike because to do that would have meant laying the bike down. There was not enough traction to do so.

 * * * * * *

" * * * And the paths of traffic had forced the excess gravel into piles that were in the center of the street between the lanes of traffic that were actually in the middle of the car lane where the two

tires would make a track. And between those two tire tracks would be a mound of gravel. And also between these two intersections there is an area there approximately triangularly shaped that did not receive an awful lot of gravel. And all of the excess gravel seemed to be finding its way into an area, and it was very deep and uneven and very difficult to—to drive through."

Appellant's father described the condition of the street thusly:

"3. At the time of the accident, July 8, 1977, and for a period of three to four weeks prior to said date, the material deposited on the street by the City of Casper had been moved by the traffic and become piled or windrowed, primarily on the north side of Mariposa Street, to a depth of approximately three to four inches."

Furthermore, Professor Judson Mathias, Ph.D., teaching at Arizona State University, stated in his affidavit that the City was remiss in allowing the gravel to windrow to the extent it did. Furnished with a copy of the police report of the accident, the complaint filed, appellant's affidavit, and other relevant information, Professor Mathias concluded:

"6. Affiant has checked with various agencies, including City of Tempe, and it is affiant's opinion that the maintenance of the street upon which plaintiff was travelling at the time of the accident was faulty and created a dangerous condition and was not up to the standards of the industry in the following respects:

"a) The City of Casper allowed gravel to windrow and remain in a windrowed condition for a period in excess of four (4) weeks;

"b) The City of Casper failed to provide signs warning vehicular traffic of the hazard;

"c) The City of Casper failed to spread windrowed material evenly across the street at regular intervals in an effort to avoid the hazardous conditions existing at the time of this occurrence."

To the contrary is the deposition of Wilbur Kiegley, safety officer for the City of Casper, who visited the scene of the accident two days after it occurred, and stated:

"A. Well, toward the right and left sides of the street there is always a certain amount of windrowing of loose chips that haven't adhered to the pavement. It was a very moderate amount of loose chips on the center of the street. I didn't observe any unusual amounts in the intersection. That is a T intersection there.

"Q. Okay. And the windrowing, the pile of chips, how deep were they?

"A. At best less than two inches.

"Q. And that was right at the area of the accident?

"A. No, not necessarily so. I would say that they were closer to the curb than the area of the accident.

"Q. How about the windrowing in the middle of the street? How deep was that?

"A. Oh, very nil, I would say. Just a scattering of it there."

We believe the above testimony creates a genuine issue of material fact and therefore summary judgment was improper. *Stephens v. Sheridan Public Employees Federal Credit Union,* supra. We have previously defined material fact as one which, if proved, would have the effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties. *Shrum v. Zeltwanger,* Wyo., 559 P.2d 1384 (1977).

## II

The motorcycle driven by appellant at the time of the accident was a 1969 TS 250, manufactured by Suzuki. The fuel tank, filler neck and gas cap, component parts of the motorcycle claimed to be defectively designed, were not recovered after the accident, and therefore, were never available for identification, inspection and testing.

A manufacturer owes a duty of care to those who use its product. The manufacturer is required to exercise reasonable care in the planning, design, and manufacturing of a product in order to insure that it is reasonably safe to use. *Caterpillar Tractor Company v. Donahue,* Wyo., 674 P.2d 1276 (1983); and *Maxted v. Pacific Car & Foundry Company,* Wyo., 527 P.2d 832 (1974).

A plaintiff alleging a design defect must, as a preliminary matter, establish a standard of conduct or duty.

"* * * Before any duty, or any standard of conduct, may be set, there must first be proof of facts which give rise to it; and once the standard is fixed, there must be proof that the actor has departed from it * * *." Prosser and Keaton, Law of Torts § 37, pp. 235–236 (5th ed. 1984).

Until the standard of conduct or duty is established, there is no question of a conflict of material facts. *Wells v. Jeep Corporation,* Wyo., 532 P.2d 595 (1975); *Maxted v. Pacific Car & Foundry Company,* supra. A determination of the standard of conduct or duty is a question to be decided as a matter of law. *Caterpillar Tractor Company v. Donahue,* supra.

In support of its motion for summary judgment, Suzuki filed the affidavit of A.F. Wilson, its national product liability manager. According to Wilson, the gas cap manufactured and designed for the motorcycle involved in this case is known as a bayonet cap and will not come off unless turned manually:

"* * * The gas cap which was manufactured and designed for the gas tank for the TS 250 involved in the *O'Donnell* accident is what is known in the motorcycle industry as a bayonet cap, which if put on the tank properly will not come off except by being turned manually to the open position by hand until released by the interworkings of the cap, neck and tank; and the only manner in which it can be otherwise forced off once properly engaged is by destruction of the tank neck and cap at the point where the cap is engaged to the tank. This latter assertion is based upon affiant's technical training, knowledge and experience

with bayonet caps on this and other models of motorcycles, regardless of whether made by Suzuki or other manufacturers. Affiant is very familiar with the industry standards pertaining to the design and manufacture of motorcycle gas caps, filler necks and gas tanks and can state that within the motorcycle industry, this bayonet cap system was considered by motorcycle designers and manufacturers to be, at the time of the manufacture of the motorcycle in the *O'Donnell* accident, the safest system for this type of motorcycle."

The affidavit states further that Suzuki's records reflect only one other claim involving the disengagement of this type of gas cap during an accident. The thrust of this affidavit is that Suzuki did not breach its duty to design a reasonably safe product or to warn users of latent dangers in its fuel systems.

In opposition to Suzuki's motion for summary judgment, appellant filed the affidavit of Dr. Harry Peterson, professor of mechanical engineering at the Colorado School of Mines. Based on his studies and testing of motorcycle design, manufacture, and crashworthiness from 1968 to the present, Dr. Peterson testified as to the known need for a fuel system safer than the one installed on 1969 Suzuki 250 motorcycles:

"3. The fuel tank on the Suzuki motorcycle involved in the instant case is constructed of thin sheet metal and crushes easily and deforms upon minimal impact. It is positioned above the frame, in front of the rider with the filler hole and gasoline filler cap on top of the tank. The gasoline tank is vented to the atmosphere through holes in the gas cap, directly in front of the operator, and between the operator's knees. Because of the manner and place of venting, gasoline and gasoline vapors will in all probability be discharged in an accident or impact directly in front of and onto the operator. When the gas tank, filled to its capacity with gasoline (100% full), is struck, dented, and its volume decreased, very high pressures are created and are relieved by gasoline squirting out the breather holes in the cap, by the cap blowing off, or by the rupture of the tank, thus creating an extreme hazard and danger of fire.

"4. In an accident, impact or upset, gasoline is discharged from the fuel system of this type motorcycle into the atmosphere approximately 60% of the instances. Fire results when the gasoline vapor mixes with the atmosphere in proper proportions and ignition occurs from the filament of a light broken in the accident, torn wiring, sparks, or some other source. * * *

"5. Experimental crashes involving motorcycles of this type show that the problem of fuel system integrity is a serious one. Gas tank caps open or come off, and the fuel tanks may rupture during impact. Fuel sprays on the rider as he moves over the cycle. * * * "

Dr. Peterson's affidavit further stated that technology was available in 1969 for the design and manufacture of stronger fuel containers, vented away from the rider. Available technology, according to the affiant, permitted the design of a fuel tank with an air space or filler neck that would prevent filling to capacity. He further testified that modification kits would have been a feasible means of correcting existing fuel systems.

The foregoing statements represent the opinions of an expert in the field of motorcycle design and crashworthiness indicating that a need existed for a system capable of containing fuel on impact and that technology available in 1969 afforded a feasible means of incorporating such a system into new and existing motorcycles. These opinions find support in tests conducted and reported by the expert affiant and in information accumulated through his study of motorcycle design, manufacture, and crashworthiness for fifteen years. Therefore, these opinions may not properly be characterized as "categorical assertions of ultimate facts without supporting evidence" which, we have held, cannot defeat

a motion for summary judgment on the issue of defective product design. *Wells v. Jeep Corporation,* supra; and *Maxted v. Pacific Car & Foundry Company,* supra. Opinion testimony of the nature presented here, offered by a qualified expert in opposition to the manufacturer's evidence that no defect exists, presents a material question of fact for trial and is entitled to evaluation by the fact finder. *Hughes v. American Jawa, Ltd.,* 529 F.2d 21 (8th Cir.1976).

 Appellant's expert testified further that as a result of tests conducted in Japan, the United States, and England, Suzuki had knowledge of the fire hazards associated with motorcycle accidents and failed to warn users against filling the fuel tank to capacity. This testimony presents a question of fact as to the extent of Suzuki's knowledge concerning the integrity of its fuel system in the event of an accident. This factual matter bears on the issue of whether Suzuki breached its duty, recognized by this court in *Parker v. Heasler Plumbing & Heating Company,* Wyo., 388 P.2d 516 (1964), to warn users of known, latent dangers.

 In its brief, Suzuki suggests problems of proof because the alleged defective parts, that is, the fuel tank, filler neck, and gas cap were never found. However, neither the affidavit of Suzuki's expert nor any other evidence in support of summary judgment refutes the allegation in the complaint that the fuel system at issue was a Suzuki product. Accordingly, the contention in the pleadings concerning Suzuki's responsibility for the allegedly defective motorcycle parts is deemed admitted for purposes of this appeal, and appellant had no obligation to produce any evidence on this point in order to withstand the motion for summary judgment.

 To prevail at trial, of course, appellant will have to show, by a preponderance of the evidence, that the fuel system was defectively designed by Suzuki and that the defect in design caused or enhanced his injuries. *Anton v. Ford Mo-*

*tor Company,* 400 F.Supp. 1270 (S.C.Ohio E.D.1975). See also, *Ford Motor Company v. Stubblefield,* 171 Ga.App. 331, 319 S.E.2d 470 (1984). However, the allegedly defective product need not necessarily be introduced into evidence in order to establish grounds for recovery. *Valentine v. Ormsbee Exploration Corporation,* Wyo., 665 P.2d 452 (1983); and *Colorado Serum Company v. Arp,* Wyo., 504 P.2d 801 (1972). Circumstantial evidence can establish that a manufacturer's defective product caused a mishap and associated injuries. *Ford Motor Company v. Arguello,* Wyo., 382 P.2d 886 (1963).

In awarding summary judgment, the trial court concluded that appellant had failed to adequately counter Suzuki's evidence that it exercised reasonable care in designing the fuel system installed on the motorcycle operated by appellant at the time of the accident. The court concluded that appellant had not established the use by other manufacturers of a safer design or the feasibility of a safer design not yet in use, pursuant to our holdings in *Wells v. Jeep Corporation,* supra, and *Maxted v. Pacific Car & Foundry Company,* supra.

 Since the summary judgment in this case was granted, we have decided *Caterpillar Tractor Company v. Donahue,* supra. In that case, the issue was whether *Caterpillar* was liable for failing to install a roll-over protection device on its front-end loaders in 1966. We affirmed the jury's finding of negligence on the part of *Caterpillar,* and followed the principles of the *Maxted* case, stating:

"In *Maxted v. Pacific Car & Foundry,* supra, we discussed what factors should be considered by the fact finder in deciding whether a manufacturer exercised reasonable care in not incorporating particular safety features on a product. One of the more significant factors there was whether other manufacturers of the same product had included the features. But, as we said, that consideration was merely a factor; it was not determinative on the issue of negligence. * * * " Id., at 1281.

It is the law in Wyoming that evidence of other manufacturers' use of certain safety features on a product is a significant, but not determinative, factor to be considered on the issue of negligence.

We have previously held that a manufacturer has a duty to design and construct his product reasonably and prudently to protect against injuries in case of collision. *Chrysler Corporation v. Todorovich,* Wyo., 580 P.2d 1123 (1978). And in *Maxted v. Pacific Car & Foundry Company,* supra, at 835, 836, it was said:

" 'In addition to liability for negligent construction, a manufacturer is required to exercise ordinary care in planning or designing his product so that it is reasonably safe for the purposes for which it is intended. * * *' 1 Frumer & Friedman, Products Liability, § 7.01, p. 104.46 (1973).

\* \* \* \* \* \*

" 'In the determination of whether or not a manufacturer has in fact exercised the care and skill of an expert, several matters are to be considered. One of the most significant factors is whether others in the field are using the same design, or a safer design. Other factors to be considered are whether a safer design not yet in use is known to be feasible, and whether in the case of a new product there has been adequate testing. [Citations.]' "

In the summary judgment proceedings of this case, appellant had a right to stand on his pleadings insofar as the alleged defective fuel system was a Suzuki product. With respect to the contention that Suzuki breached its duty to design a reasonably safe product, appellant established the existence of a genuine issue of material fact.

Appellant has asserted as an alternative cause of action strict products liability as set out, in pertinent part, in the Restatement of Torts:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it was sold." Restatement (Second) Torts 2d § 402A, pp. 347–348 (1965).

The summary judgment in the district court was based upon appellant's cause of action for negligent design. Therefore, we decline to address strict products liability for the first time in this court.

Reversed and remanded for further proceedings consistent with this opinion.

ROONEY, Justice, concurring in part and dissenting in part, with whom RAPER, Justice, Retired, joins.

I concur with that part of the majority opinion having to do with Suzuki, but I dissent from that part of the opinion having to do with the City of Casper.

## THE MAJORITY OPINION

The majority opinion abandons logic, and it abandons the wisdom of our predecessors on the basis of theoretical exploration commonly indulged in by law professors to challenge the thinking of law students, but from which the law professors generally retreat in the final solution of the law problem in favor of the practical and common sense solution of it.

The majority opinion would dissect negligence by removing one of its essential elements and then treat the remaining elements as a viable whole in comparing them with the dissected element. Negligence consists of a duty, a violation of the duty, proximately causing the injury. *ABC Builders, Inc. v. Phillips,* Wyo., 632 P.2d 925, 931 (1981); *Beard v. Brown,* Wyo., 616 P.2d 726, 734 (1980); *Danculovich v. Brown,* Wyo., 593 P.2d 187, 195 (1979). The majority opinion sets "duty" off from "negligence" and then discusses the presence, or absence, of "negligence" without one of its component parts.

The majority opinion will completely change the status of negligence law in this state. If its reasoning is applied to questions of degrees of duty, i.e., re dangerous instrumentalities, contract duty, statutory duty, trespasser-licensee-invitee duty, of unavoidable accident, of notice of created nuisance or danger, of intervening cause, of res ipsa loquitur, etc., all of the past understanding relative thereto is abandoned.

The majority opinion concerns itself with duty only in so far as it is involved in the well-established requirement that the City must use reasonable care in maintaining the streets and sidewalks in a reasonably safe condition. The dilemma in this case arises from the fact that the City was exactly fulfilling this duty in resurfacing the street and thereby making its condition safe for the traveling public. Under the majority opinion, a city would be foolish to attempt to repair any street in the manner accepted in the past, i.e., remove and replace or reinforce the hard surface, seal it with sealant and gravel, traffic compress the gravel, and then remove the excess gravel. Under the majority opinion, any accident occurring on that street during the repair process could result in city exposure to liability. To repair a street under the majority opinion, some other means would have to be invented to compact the gravel, all at great inconvenience to the public and at considerable increase in expense. As noted ante, the duty to be considered here is not a duty to maintain safe streets per se, but it is the duty to make repairs to the streets in a reasonably safe manner. The duty may be to post warning notices or warning lights of a dangerous situation temporarily occasioned by repair, or the duty may be the obligation to remove excess gravel within a reasonable time. In this connection, I believe it to be logical, not illogical, as said in the majority opinion, to impose a duty to warn of a danger occasioned by a small hole not easy to see and not to impose a duty to warn against driving over a cliff or a 300-foot hole which is obvious to the driver from a great distance. It seems logical not to impose a

duty to warn someone from walking through a doorway when the door is obviously closed without first opening it, whereas it would be logical to impose a duty to warn against walking through a doorway into a contaminated area.

The majority opinion indulges in considerable discussion about the existence of a duty which the known and obvious danger of a situation does away with or negates. Of course, such is not the known and obvious danger rule at all. If there is a known and obvious danger there is no duty in the first instance to negate. For example, there is simply no duty in the first instance to tell a person, when delivering a gun to him, that if he loads it and points it at himself and pulls the trigger, he could be hurt; or if he drives his car over a 300-foot embankment, he could be hurt; or if he slips on a perceptibly icy and snowy street or sidewalk, he could be hurt; or if he rides a motorcycle on gravel it could slip from under him and he could be hurt.

"* * * The law imposes upon a person, sui juris, the obligation to use ordinary care for his own protection, the degree of which is commensurate with the dangers that are to be avoided; and one who voluntarily and unnecessarily assumes a position of danger the hazards of which he understands and appreciates, or of which he should be aware, cannot recover for an injury from a risk incident to the position in which he has placed himself. * * *" 57 Am.Jur.2d Negligence § 319, p. 721 (1971).

See *Sherman v. Platte County*, Wyo., 642 P.2d 787 (1982).

The majority opinion does not distinguish between "assumption of risk" and the "known and obvious danger" rule. There is an important distinction. In the first place, we have not recognized "assumption of risk" in Wyoming as an independent defense to a negligence action. We have considered it as being embraced in contributory negligence. *Ford Motor Company v. Arguello*, Wyo., 382 P.2d 886, 891 (1963). Yet, we have always recognized the independent defense of "obvious danger."

*Bluejacket v. Carney,* Wyo., 550 P.2d 494, 497 (1976); *Continental Motors Corporation v. Joly,* Wyo., 483 P.2d 244, 246 (1971); *McKee v. Pacific Power and Light Company,* Wyo., 417 P.2d 426, 427 (1966). In the second place, assumption of risk is an act of volition by the plaintiff which will defeat, or lessen, his recovery for negligence of the defendant.

> " * * * [T]he term 'contributory negligence' necessarily presupposes negligence for which the defendant is liable, which would be actionable but for the concurrence of the contributory negligence. * * * " *Stanolind Oil & Gas Co. v. Bunce,* 51 Wyo. 1, 62 P.2d 1297, 1301 (1936).

Whereas, the "known and obvious danger" rule is premised on there being no negligence on the part of the defendant in the first instance. In other words, the "assumption of risk" or contributory negligence aspect is something which results from the *plaintiff's* position, whereas the "obvious danger" aspect results from the defendant's position, i.e., there can be no negligence on his part if the danger is obvious to everyone including the plaintiff. *A duty on the part of defendant never arises.* I commented on this distinction in my specially concurring opinion in *Sherman v. Platte County,* supra, 642 P.2d at 790:

> "I must elaborate somewhat on that said in the majority opinion relative to appellant's contention that the obvious-danger rule as set forth in Instruction No. 17 [1] has been 'abrogated' by the adoption of the comparative negligence statute in Wyoming.
>
> "The fallacy in appellant's argument is in reading into the instruction a direction to the jury for an assumption of risk by *appellant* rather than reading therein a definition of the duty owed by *appellee.* Even before enactment of the comparative negligence statute in Wyoming, a distinction between assumption of risk and contributory negligence was not recognized. Assumption of risk was but a form of contributory negligence. Subsequent to enactment of the comparative

negligence statute, assumption of risk, as a form of contributory negligence, is only a basis for apportionment of fault. *Brittain v. Booth,* Wyo., 601 P.2d 532 (1979).

> "In a negligence action, the jury is now called upon to ascertain the fact of negligence, if any, on the part of each of the parties, and then to apportion such negligence between them.
>
> * * * * * *
>
> "The adoption of the comparative negligence statute did not 'abrogate' any duty or standard of care. It simply directed consideration of 'comparative fault.' " (Emphasis in original and footnote 2 omitted.)

Footnote 1 in the first paragraph of this quotation reads:

> "1. Instruction No. 17 reads:
>
> > " 'An owner or occupant of land or premises does not have an obligation to protect his invitees against dangers that are known to them or that are so obvious and apparent that they may reasonably be expected to discover such dangers.' "

## CITY LIABILITY

This case is not complicated; it requires only the simple application of established law. Summary judgments are seldom granted in negligence cases. *Keller v. Anderson,* Wyo., 554 P.2d 1253, 1257 (1976); *Gilliland v. Steinhoefel,* Wyo., 521 P.2d 1350, 1352 (1974). But they should be granted when the summary judgment requirements are definitely met. *Keller v. Anderson,* supra. Since "duty" is a necessary element of negligence, a negligence action cannot be maintained if there is no "duty," and duty is a question of law to be determined by the court. *Moewes v. Farmers Insurance Group,* Wyo., 641 P.2d 740, 744 (1982); *Vassos v. Roussalis,* Wyo., 625 P.2d 768, 772 (1981), appeal after remand 658 P.2d 1284 (1983).

This does not mean that in all instances summary judgment is proper when the question involves the existence of a duty.

There may be factual determinations necessary to the decision on the issue of duty. If so, a summary judgment would not be proper. Rather, the court should present the factual issues to the jury and, from the jury resolution of such issues, make a decision on the existence of a duty. This is normally accomplished by instructions which direct "If you find x, then you shall * * *." "If you find y, then you shall * * *."

> "The determination of any question of duty—that is, whether the defendant stands in such relation to the plaintiff that the law will impose upon him an obligation of reasonable conduct for the benefit of the plaintiff—has been held to be an issue of law for the court and never one for the jury. However, where fact issues arise in the application of the rule, or the drawing of varying inferences from the facts in evidence is possible, a question for the jury may arise, but the enunciation of the duty upon the facts found is for the court, not the jury. * * *" 57 Am.Jur.2d Negligence § 34, p. 381 (1971).

A fact issue relative to the known and obvious danger, and thus the duty, is not present in this case. The fact that it was a known and obvious danger is not disputed. Appellant's knowledge of the presence of the gravel and the danger resulting therefrom was before the court in appellant's deposition. Appellant was giving a party at the home of his parents. He borrowed the motorcycle of one of his guests to take a "spin" around a few blocks. As he returned and was going by the house, the accident occurred. He testified in his deposition:

> "I accelerated out of the intersection. I remember thinking to myself at that point be careful because there is gravel on a turn, something like it's the easiest place to lose a bike."
>
> "* * * And in my mind flashed a couple alternatives of things I could do. One was I was going to lay the bike down and slide into the car. I didn't want to do that *because I'd heard of people sliding*

*on gravel,* and they had to get it picked out. * * *" (Emphasis added.)

> "Q. And as I understand, you don't recall exactly when the streets were graveled, but it was some time before?
>
> "A. It was sometime before the accident.
>
> "Q. A few days before?
>
> "A. I did not see the gravel being put down. I don't know.
>
> "Q. But you were aware it was there. You'd been driving over it to and from work?
>
> "A. I was aware the gravel was there."
>
> "Q. How fast were you driving the bike?
>
> "A. I remember particularly being very cautious that day. The street was—had gravel all over it, and in fact a good deal of the neighborhood did around there as I was riding the bike. And motorcycles are very difficult to control on a street that has gravel on it."
>
> "Q. And then as I understand you gave, at the very beginning of your deposition, a number of streets that you went on and the number of turns.
>
> "A. Yes.
>
> "Q. Throughout your travel that area, were all those streets graveled?
>
> "A. As I recall, yes.
>
> "Q. As I understand, you've indicated you did not go any faster than 30 miles an hour.
>
> "A. No, because as I stated earlier, because of the nature of the streets, all the gravel on it, there would have been a great deal of risk involved in that of losing control of the bike.
>
> "Q. It's a little harder to control the bike under those circumstances, correct?
>
> "A. Yes, it is."

Inasmuch as the danger was known and obvious to appellant, the City owed him no duty with reference to the gravel on the street, and the summary judgment was proper.

> "* * * Thus, although a duty rests upon a municipality, where an obstruction is permitted to remain in a highway or

street, to give notice to the traveling public of its presence, yet, no other notice is needed than a view of the obstruction itself, where it can be seen in ample time to avoid injury. * * *" 57 Am. Jur.2d Negligence § 126, p. 477 (1971).

As an aside I must note that even assuming for the sake of argument an existence of a duty on the part of the City, there was nothing before the trial court to establish a question of fact relative to the violation of such duty. Unless a res ipsa loquitur approach is proper, the *only* facts set forth in the depositions and affidavits reflected reasonable action by the City under the circumstances. Witness Keigley testified that the City followed a well recognized and nationally approved procedure in resurfacing the streets and that the procedure was used in this instance. The operation was performed on June 7, a month before the July 8 accident. He explained that the weather, street conditions, and traffic determined the length of time the gravel was to be left on the street. He said that the gravel is normally swept back at regular intervals. He testified:

"Q. Was there any—was anything else done to the street from June 7 to July 8, the day of the accident?

"A. Only the routine brooming back on it, the bare areas of oil, what we call bleeding through where the chips did not adhere in the well traveled path of the road. We go in there with a sweeper, street sweeper, and use a broom to swirl and sweep it back over there.

"Q. When was that?

"A. I can't give you an exact date on that, but it may have been done two or three different times.

* * * * * *

"A. The traffic is allowed to travel on that for impregnation of the aggregate into the road bed anywhere from it could be one day to a month, depending on the conditions. Because if it's hot, we have bleeding on the street, we have to broom back. The chips are left on the road surface pruposely so that they can protect, you know, not only the street surface that we have sealed but to protect the vehicles from picking up and carrying a lot of oil on to the bodies of the car[s].

"Q. Okay.

"A. After they have had a sufficient time—now, these streets are checked daily by a foreman to see how they are curing, and all, and to see what the conditions are. And when we feel that there is no further need for the excess chips, then we send the sweepers in there to remove them. And there again, there is really no set time on it. If you were asking for a normal, a normal could be anywhere from five days to five weeks.

* * * * * *

"Q. Do you have any personal knowledge as to whether or not the street Mariposa in the area of the accident and in that area was ever—material was ever swept back into the street from June 7 to July the 8th of 1977?

"A. I observed them sweeping in that area; but what days it was, it was shortly thereafter because we were still working that whole area up there for additional seal coating.

"Q. Shortly thereafter the accident or after the seal coating?

"A. Well, shortly thereafter they seal coated.

"Q. On how many occasions did you personally observe that?

"A. I would say at least twice, three times.

"Q. So you have personal knowledge that the area where the accident occurred was swept at least twice, maybe three times from June 7 to July the 8th 1977?

"A. Undoubtedly, yes. At least that.

"Q. I'm not sure that's—

"A. Well, what I mean there is, because of the traffic in there, the brooming operation has to take place because you don't get a hundred percent coverage of the fresh oil the first time around. And it could be two or three or four days later

before the bare spots show up. Then you have to broom it back in there.

"So there is no doubt in my mind that we were back in there at least two or three different times.

"Q. I understand that. But my question is your personal knowledge. Not what you believe had to have happened, but what you actually know happened.

"A. I couldn't say—

"MR. NEVILLE: Just a second. He's asking you if you yourself through your own eyes saw sweepers on Mariposa or at the scene of the accident between June 7 to July 8. With your own eyes.

"THE DEPONENT: I would have to say yes, I did observe sweepers in there.

"Q. (BY MR. MILLER) On two occasions?

"A. At least two occasions."

Keigley testified that accompanied by J.C. Jackson, he observed the scene of the accident on the second day after it occurred, and that:

"Q. All right. Approximately how long after the accident occurred did he ask you to look into it?

"A. Well, he and I took a ride, I believe it was, two days after the accident happened. We looked at the area.

"Q. All right. What did you observe when you got there?

"A. I didn't observe anything unusual. I was asked to take a look specifically at the condition of the street, the presence of, you know, stone chips from a previous sealing operation. I didn't see anything unusual.

"Q. Had anything been with [sic] done to the street between the time of the accident and the time you observed it?

"A. Nothing that I could tell.

"Q. Was there still material on the street that had been left there from the sealing operation?

"A. I would say a moderate to a normal amount, yes.

"Q. Give me some idea of—

"A. Well, toward the right and left sides of the street there is always a certain amount of windrowing of loose chips that haven't adhered to the pavement. It was a very moderate amount of loose chips on the center of the street. I didn't observe any unusual amounts in the intersection. That is a T intersection there.

"Q. Okay. And the windrowing, the pile of chips, how deep were they?

"A. At best less than two inches.

"Q. And that was right at the area of the accident?

"A. No, not necessarily so. I would say that they were closer to the curb than the area of the accident.

"Q. How about the windrowing in the middle of the street? How deep was that?

"A. Oh, very nil, I would say. Just a scattering of it there."

There was nothing in the record to refute the testimony of Mr. Keigley to the effect that the street was swept two or three times between the application of the seal and the time of the accident. Judson S. Matthias, a professor at Arizona State University, furnished an affidavit in which he stated that the maintenance of the street was faulty because the gravel was allowed to remain in a windrowed condition "for a period, in excess of four (4) weeks" and because the gravel had not been brushed at regular intervals. The affidavit was not based on personal knowledge of such fact but was premised on a review of the City's answers to interrogatories, appellant's deposition, and the police report of the accident. None of them reflect the fact that the windrows were allowed to remain for four weeks or that the gravel had not been brushed for four weeks. Rule 56(e), W.R. C.P., provides that "[s]upporting and opposing affidavits shall be made on personal knowledge."

There is nothing specific in the record to counter Mr. Keigley's testimony as to the specific depth of the gravel at the place of the accident. Appellant described the depth of the gravel in general terms—see quotation, supra. The nearest he came to specifying the amount of gravel was:

"A. * * * And the paths of traffic had forced the excess gravel into piles that were in the center of the street between the lanes of traffic that were actually in the middle of the car lane where the two tires would make a track. And between those two tire tracks would be a mound of gravel. And also between these two intersections there is an area there approximately triangularly shaped that did not receive an awful lot of gravel. And all of the excess gravel seemed to be finding its way into an area, and it was very deep and uneven and very difficult to—to drive through."

Appellant's father, in his affidavit, fixed the depth of the gravel *on the north side of the street* at approximately three to four inches:

"3. At the time of the accident, July 8, 1977, and for a period of three to four weeks prior to said date, the material deposited on the street by the City of Casper had been moved by the traffic and become piled or windrowed, primarily on the north side of Mariposa Street, to a depth of approximately three to four inches."

The testimony was that the accident happened on the south side of the street and appellant did not drive north of the westbound traffic lane. Of course, both appellant and his father were in the unenviable position of contending for the presence of excessive gravel to establish negligence on the part of the City and in doing so also establishing a known and present danger which would absolve the City from liability. Either lack of excessive gravel or the danger of excessive gravel being known and present would justify the summary judgment.

Appellant testified that he was proceeding west on Mariposa Street in the westbound lane and when he reached a point in front of his house, an automobile driven by Walford[1] pulled away from the north curb and into the westbound lane of traffic, forc-

ing appellant to turn into the eastbound lane of traffic. He lost control of his motorcycle and continued westbound for a short distance before hitting a parked automobile on the south side of the street.

### SUZUKI LIABILITY

I concur with the majority opinion with reference to the existence of error in granting summary judgment in favor of Suzuki. Under the majority opinion, the verdict form, for the purpose of apportioning negligence, will request determination of degrees of negligence on the part of appellant, the City, Suzuki and Walford. I would not include the City on such form by virtue of affirming the trial court's summary judgment in favor of the City.

---

1. Walford, one of the guests at the party and described by appellant as intoxicated while at the party, was originally named a defendant but settled for $25,000, the limits of his insurance policy.