James ALLEN, Sharon Allen, Plaintiffs–Appellants,

v.

VERSON ALLSTEEL PRESS, Defendant–Appellee.

No. 91–1156.

United States Court of Appeals, Sixth Circuit.

Feb. 27, 1992.

George T. Fishback (argued and briefed), Sachs, Nunn, Kates, Kadushin, O'Hare, Helveston & Waldman, Detroit, Mich., for plaintiffs-appellants.

John J. Lynch, Birmingham, Mich., Gary R. Campbell, Smith & Brooker, Saginaw, Mich., Mark L. Hellner (briefed), E. James Gildea (argued and briefed), Chicago, Ill., for defendant-appellee.

Before BOGGS and NORRIS, Circuit Judges, TIMBERS, Senior Circuit Judge.*

ALAN E. NORRIS, Circuit Judge.

Plaintiffs, James and Sharon Allen, appeal from the district court's order granting summary judgment to defendant, Verson Allsteel Press. Plaintiffs contended that James Allen was injured by a defectively designed power press which had been manufactured by Verson.

On September 18, 1987, James Allen, while an employee at Lobdell–Emery Manufacturing Co., volunteered to fill in for an absent worker whose duties included the lubrication of presses. Allen had operated some presses at the plant, but had never before oiled them. He was injured while filling the oil reservoir on the press manufactured by Verson. He had climbed onto a rail that was about two feet above floor level in order to fill the reservoir, a cylindrical tank located on the side of the press. To steady himself, he held on to the edge of an opening in the press where a counterbalance piston operated. This unguarded "pinch point" opening was located ninety-seven inches above floor level. Unaware of Allen's presence, the operators of the press activated it, with the result that the piston crushed three fingers of his left hand.

The press was manufactured by Verson in late 1965 and delivered to Lobdell–Emery shortly thereafter. The pinch point where Allen's hand was injured was unguarded, but access to it was obstructed from below by a large electrical box that protruded from the face of the press. As manufactured and installed, the oil reservoir was filled through a pump mechanism located at the bottom of the reservoir, six feet above the floor, about two feet from the pinch point. However, by the time of the accident, the original reservoir had been replaced with one that had to be filled from above, eight and one-half feet above floor level, next to the pinch point. The rail onto which Allen climbed was not part of the original design.

Verson filed a motion for summary judgment, claiming that the Allens were unable to make out a *prima facie* case of design defect because the conditions under which Mr. Allen was injured were not foreseeable.

Plaintiffs argued that the press was inherently dangerous and lacked safety features established by industry standards. They further contended that the modifications to the press were known or foreseeable by Verson, which breached a duty to warn.

In its opinion granting summary judgment, the district court noted that, under Michigan case law, the issue raised by a cause of action based upon defective design of a product is whether the manufacturer took reasonable care in light of any reasonably foreseeable use of the product which might cause injury. *See, e.g., Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 326 N.W.2d 372 (1982). As evidence that the press was defectively designed, plaintiffs relied upon industry standards promulgated in 1972, calling for moving parts less than 108 inches from the ground to be guarded. The district court pointed out that the sale of the press occurred prior to the promulgation of those standards, and that the ones in effect at that time called for guarding areas less than eighty-four inches from the ground, a standard surpassed by Verson's press.

The district court concluded that Verson must prevail as a matter of law on the element of foreseeability, since the evidence on summary judgment did not present sufficient disagreement to require submission to a jury, and gave three reasons for that conclusion. First, plaintiffs presented no evidence that the press was not in compliance with industry standards in effect at the time of manufacture and delivery. Second, the injury occurred in a location where it was not foreseeable that anyone would be injured, since that loca-

---

* The Honorable William H. Timbers, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

tion was too far removed from the ground to present any danger to those working around the press. Finally, no reasonable jury could conclude that the alteration of the lubrication system, from one which was to be filled and maintained from the ground level to one which was to be filled from above, was foreseeable by Verson at the time of manufacture. The court noted that there was no evidence adequate to indicate that Verson had participated in the modifications.

We are unable to say that the district court erred, since it is apparent from our review of the record that plaintiffs failed to satisfy their burden of making a showing that they were in possession of evidence of specific facts that would establish the existence of an element essential to their case, on which they bore the burden of proof at trial, as required by the *Celotex* trilogy of cases and its progeny. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the judgment of the district court is affirmed upon the reasoning set out by that court in its order of January 9, 1991.

TIMBERS, Circuit Judge, dissenting:

The majority holds that summary judgment was proper in this case because appellants James and Sharon Allen (Allen) failed to present sufficient evidence showing that the type of injury Allen sustained was foreseeable. Since I believe that the evidence presented by Allen was sufficient to have his action against appellee Verson Allsteel Press (Verson) decided by a jury, I respectfully dissent.

Allen commenced this action based on theories of negligence and breach of implied warranty. He alleged primarily that the press on which he was injured had been defectively designed by Verson. Specifically, Allen claimed that the press was defectively designed because the pinch point in which his hand was injured was not properly guarded.

The Michigan Supreme Court has adopted "a pure negligence, risk-utility test" for determining whether a manufacturer can be held liable for injuries caused by defectively designed products. *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 691, 365 N.W.2d 176, 185 (1985); *Reeves v. Cincinnati, Inc.*, 176 Mich.App. 181, 185, 439 N.W.2d 326, 328 (1989). In order to recover damages from Verson on his claim for defective design, Allen had to show that Verson's failure to guard the pinch point created an unreasonable risk of foreseeable injury. *Prentis, supra*, 421 Mich. at 694, 365 N.W.2d at 187; *Owens v. Allis–Chalmers Corp.*, 414 Mich. 413, 425, 326 N.W.2d 372, 377 (1982). A manufacturer has an obligation to anticipate and protect against injuries that may result from the normal use of its products or from reasonably foreseeable misuses. *Trotter v. Hamill Mfg. Co.*, 143 Mich.App. 593, 602, 372 N.W.2d 622, 626 (1985). A prima facie case of defective design predicated upon the omission of a safety device requires a showing of the magnitude of the foreseeable risks involved, and the feasibility of the proposed alternative design. *Owens, supra*, 414 Mich. at 429, 326 N.W.2d at 378–79; *Kinzie v. AMF, Inc.*, 167 Mich.App. 528, 534, 423 N.W.2d 253, 256 (1988).

I recognize that negligence actions against a products manufacturer may be dismissed on summary judgment if "the plaintiff's claims are so clearly unenforceable as a matter of law that no factual development can possibly justify a right of recovery", *Trotter, supra*, 143 Mich.App. at 596, 372 N.W.2d at 623, or if "overriding considerations of public policy require that a particular view be adopted and applied in all cases", *Moning v. Alfono*, 400 Mich. 425, 450, 254 N.W.2d 759, 770 (1977). And, as the majority states, the United States Supreme Court has encouraged summary judgment where plaintiffs fail to make an adequate showing that they will be able to prove essential elements of their case. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Nevertheless, the risk-utility analy-

sis adopted by the Michigan courts for determining whether a manufacturer is liable for injuries caused by a defectively designed product generally should be performed by the jury. *Moning, supra,* 400 Mich. at 434, 254 N.W.2d at 763. The jury should "apply[ ] the community's judgment of how reasonable persons would conduct themselves, [and] should make the ultimate value judgment of the risks and societal importance of the interests involved...." *Id.,* at 435, 254 N.W.2d at 763. This preference for having juries decide the issue of negligence "is rooted in the belief that the jury's judgment of what is reasonable under the circumstances of a particular case is more likely than the judicial judgment to represent the community's judgment...." *Id.* at 435–36, 254 N.W.2d at 763 (citing Prosser, *Torts* § 35, at 188 (4th ed. 1971)). With this in mind, I now turn to the propriety of the district court's dismissal of Allen's claims on summary judgment.

Allen relied in part upon industry standards to show that the press on which he was injured was defectively designed. As stated by the majority, Allen presented evidence that the press failed to meet the industry standards promulgated in 1972 by the American National Standard Institute (ANSI). ANSI B15.1–1972 describes two types of guarding requirements: guarding by enclosure and guarding by location. Since it was undisputed that the access point to the counterbalance piston mechanism (the opening) where Allen's hand was crushed was not guarded by enclosure, the issue before the district court was whether the opening was guarded by location. To be "guarded by location" under the 1972 standard, "equipment [having] in-running nips, shear points or moving projections ... shall be a minimum of 108 inches above the pertinent floor, platform, or working level." ANSI B15.1–1972 § 9.1.1. Since the pinch point where the counterbalance piston operated was only 97 inches from the floor, it was inadequately guarded under the 1972 standard. The district court, however, properly concluded that the applicable standard is that contained in ASA B15.1–1953, which was in effect when Verson manufactured and sold the press to Lobdell in 1965. Since the 1953 standard required only that unguarded moving parts be at least 84 inches from the floor, the court properly found that Verson had complied with that standard.

Verson's compliance with the 1953 standard, however, is not dispositive as to whether Verson negligently designed the press on which Allen was injured, *Owens, supra,* 414 Mich. at 423, 326 N.W.2d at 375, and should not have precluded Allen from having his case decided by a jury. *Id.; see also Granger v. Fruehauf Corp.,* 429 Mich. 1, 412 N.W.2d 199 (1987) (The fact that industry standards did not require a ladder on truck trailers did not preclude the jury from finding that the truck manufacturer was liable for injuries caused by the absence of such a ladder); *see also Sours v. General Motors Corp.,* 717 F.2d 1511, 1516–17 (6th Cir.1983). Judge Learned Hand described the appropriate weight to be accorded industry standards:

> "Indeed, in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new safety devices. It may never set its own tests, however persuasive be its usages."

*The T.J. Hooper,* 60 F.2d 737, 740 (2nd Cir.1932). The relevance of the 1953 standard to this case is diminished by the fact that it was at least 12 years old when Verson manufactured and sold the press. As the district court observed, the suggested standards for guarding moving parts on machines have "evolved over time."

Allen did not rely solely on evidence of the 1972 industry standard to support his claim that Verson failed reasonably to safeguard the press on which he was injured. He testified by deposition that he would not have put his hand in the area where it was crushed if there had been a guard over the opening, or if there had been a specific warning of the danger in that area. Moreover, cross-examination of Donald Bernotus, who began working for Verson in 1965 and who testified by deposition as Verson's expert witness, elicited the following:

"Q. *So if somebody should reach up and grab that area where the press is moving they could get their fingers clipped off just like Mr. Allen did?*

A. *Well yeah. It would crush them at least.* (Emphasis added).

\* \* \* \* \* \*

Q. You recognize what pinch points are in presses, right?

A. Sure.

Q. You've probably known for years how to guard pinch points in presses, right?

A. Sure.

Q. You can guard pinch points simply as [sic] putting a shield depending on the type of pinch point it is?

A. Well, it depends. Some of them may do it with a shield or a guard, others may not be that easy to guard.

\* \* \* \* \* \*

Q. Back in the 50's did you deal with guarding?

A. Well I'm sure I did. I can't be specific, because it would be something you would do in a normal course of work."

This testimony shows that Verson was aware that the pinch point on the press where the counterbalance piston operated would cause severe injury if a person placed his hand in the unguarded opening. Furthermore, this testimony indicates that Verson may well have been able to guard the opening leading to the pinch point simply by utilizing the type of shields that were common in the industry at the time Verson manufactured the press. Allen therefore satisfied, at least for purposes of surviving Verson's motion for summary judgment, the requirement set forth in *Owens, supra*, 414 Mich. at 429, 326 N.W.2d at 378–79, that he present evidence regarding the magnitude of the risk and the feasibility of an alternative design. *See also Scott v. Allen Bradley Co.*, 139 Mich.App. 665, 671, 362 N.W.2d 734, 737–38 (1984) (Testimony of defendant's expert that the company had been producing switch guards since approximately 1955, together with the introduction at trial of guards that cost only \$1 to produce, held to satisfy *Owens* standard.)

The majority in my view placed undue emphasis on Verson's compliance with the 1953 standard in determining that Allen's claim against Verson should not be submitted to a jury. Regardless of the exact distance from the floor to the opening on the press where Allen's hand was crushed, it is clear that the opening was close to the point at which the oil reservoir had to be refilled. Even without the modification of the oil reservoir (which required that it be filled from above at a height of approximately 102 inches from the floor), the oil reservoir would have to be filled at a point six feet (72 inches) above the floor, and just two feet away from the opening where Allen was injured. Thus, as the press originally was designed and manufactured by Verson, the close proximity of the point at which the oil reservoir had to be refilled to the pinch point where Allen's hand was crushed should have alerted Verson to the need for more safeguards in order to protect against injuries such as Allen sustained. It is clear to me that the district court erred in concluding, as a matter of law, that Allen's injury was unforeseeable simply because it occurred 97 inches above the work floor.

To summarize:

Allen presented sufficient evidence that Verson negligently designed the press on which he was injured to have his claim submitted to a jury. I therefore respectfully dissent from the majority's summary dismissal of Allen's claim.