Victor and Nancy FISHER, Plaintiffs,

v.

KAWASAKI HEAVY INDUSTRIES, LTD.,
and Kawasaki Motors Manufacturing
Corporation, U.S.A., Defendants.

No. 92–CV–10059–BC.

United States District Court,
E.D. Michigan,
Northern Division.

Feb. 2, 1994.

468

Jeffrey Cook and Sheldon D. Erlich, Detroit, MI, for plaintiffs.

John R. Secrest and Scott R. Torpey, Farmington Hills, MI, for defendants.

## ORDER AND MEMORANDUM OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CLELAND, District Judge.

## I. BACKGROUND

This matter is before the Court on Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons stated below, the Court GRANTS Defendants' motion for summary judgment.

Plaintiff purchased a 1982 Kawasaki 750 Spectra motorcycle on May 11, 1987. On July 11, 1990, while riding said motorcycle, plaintiff swerved to avoid a deer, collided with the deer, the motorcycle turned on its side, gas leaked, and ignited. Plaintiff was severely burned.

Defendant Kawasaki Motors Corporation is a subsidiary of Kawasaki Heavy Industries. Plaintiff's second amended complaint (amended to include an allegation of a defective fuel system as well as a defective gas cap) avers the following five counts: (1) design defect; (2) failure to warn "of the danger of gasoline leaking through the gas cap and fuel system and igniting during foreseeable collisions and tipping over of the motorcycle"; (3) statutory liability (Mich.Comp. Laws 600.2945); (4) breach of warranty (implied) (Mich.Comp.Laws 440.2314, 440.2313); and (5) loss of consortium.

Having read the motions, briefs and accompanying documents, as well as having heard oral argument in this matter on November 17, 1993, the Court grants summary judgment in favor of Defendants and dismisses the cause of action for the reasons stated below.

## II. STANDARD

Summary judgment is proper only where the moving party shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). There is no genuine issue of material fact when "the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The court is required to ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). The party opposing summary judgment must present "affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 1479, citing *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

### A. Prima facie case: design defect

█ A manufacturer has a duty to design its product so as to eliminate any unreasonable risk of foreseeable injury. *Prentis v. Yale Manufacturing Co.* 421 Mich. 670, 693, 365 N.W.2d 176 (1984); *Owens v. Allis–Chalmers Corp.*, 414 Mich. 413, 425, 326 N.W.2d 372 (1982); *Scott v. Allen Bradley Co.*, 139 Mich.App. 665, 670, 362 N.W.2d 734 (1984); *Reeves v. Cincinnati, Inc.*, 176 Mich.App. 181, 185, 439 N.W.2d 326 (1989).

In order to establish a prima facie case of design defect a plaintiff must show:

'through direct or circumstantial evidence a reasonable probability that the defect is attributable to the manufacturer or seller.' [ ] the plaintiff is [also] required to present

evidence concerning both the magnitude of the risk involved and the reasonableness of the alternative design. *Kinzie v. AMF Lawn & Garden, Div. of AMF, Inc.,* 167 Mich.App. 528, 535–536, [423 N.W.2d 253] (1988) (internal citations omitted).

In *Owens, supra,* 414 Mich. at 425, 326 N.W.2d 372, the Michigan Supreme Court set forth the requisite proof to create a question of fact in a design defect case. *Owens* involved an accident with a forklift in which plaintiff's decedent was killed when the unit he was driving overturned. No mechanical problems were discovered, but plaintiff argued that the forklift was improperly designed because it failed to provide a driver restraint as standard equipment. *Owens,* 414 Mich. at 417, 326 N.W.2d 372. The trial court granted the defendant manufacturer's motion for a directed verdict on the basis that plaintiff had failed to establish an unreasonable risk of foreseeable injury.

In affirming the trial court's decision, the Michigan Supreme Court provided a basis for determining whether a manufacturer has been negligent. In evaluating the reasonableness of a manufacturer's design decision, the factors to be considered are: (1) the magnitude of the risks of injury involved, including the likelihood of the occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident and (2) the reasonableness of the proposed alternative design and whether that device would have been effective as a reasonable means of minimizing the foreseeable risk of danger. *Reeves, supra,* 176 Mich.App. at 187–88, 439 N.W.2d 326 (1989); *see also* Ernest R. Bazzana et al., *Owens v. Allis–Chalmers: The Standard of Proof in a Design Defect Case,* Michigan Bar Journal, Feb. 1990, at 166 (citing *Owens,* 414 Mich. at 429, 326 N.W.2d 372). To show defective design, a plaintiff must produce sufficient evidence concerning these factors. Absent such evidence, a plaintiff has not presented a *prima facie* case and the defendant manufacturer is entitled to judgment (either by way of summary judgment or, as in *Owens,* by a directed verdict) as a matter of law.

In applying its two-part test to the facts presented by the plaintiff's expert, the court in *Owens* determined that plaintiff failed to present a *prima facie* case. In assessing the magnitude of the risks the court noted that, while there was evidence presented from which one could infer that the injuries resulting from being pinned under a forklift were *foreseeable,* there was no indication as to *how likely* it would be for such an injury to occur. *Owens,* 414 Mich. at 430, 326 N.W.2d 372. Accordingly, the court held that "where the magnitude of the risks is quite uncertain because it is dependent upon an unknown incidence of [the specific injury in question], an examination of the effects of any proposed alternative design must bear a *heavy burden* in determining whether the chosen design was unreasonably dangerous." *Id. (emphasis added).*

In assessing the "reasonableness of the proposed alternative design" the *Owens* court noted that there was no testimony concerning the effects of a cage (which plaintiff proffered as an alternative design) upon the driver's ability to perform his work. Nor was there any factual testimony concerning the safety of a operator in the cage if a rollover were to occur. Furthermore, no evidence was provided concerning the effects of the use of other restraints suggested by plaintiff as alternatives. *Id.* at 431, 326 N.W.2d 372.

Plaintiffs in the instant case have offered evidence, by way of deposition, as to alternative designs of motorcycle fuel systems. Specifically, Plaintiffs' expert, Dr. Peterson, offers three alternative designs:

Q. Just so I am clear, I think I am, one of the alternative designs is, of course, the tank that's protected by these two, I'll call it, front leg protection devices that you have described for us, is that a fair statement, going back to '82?

A. Yes. That's one, yes. [Peterson Dep, p. 144].

Q. All right. Now, also back in '82, to use a word, did you want to do away with carburetors? [Id., p. 144].

A. That I think it was—yes. We talked—in one case we talked about carburetor leaks and the possibility of eliminat-

ing the carburetor leak problem by going to fuel injection. [Id. at 145].

\*   \*   \*   \*   \*   \*

Q. Okay. Now, another alternative design—am I using the term right?

A. Yes.

Q. You know what I am talking about. Would be to relocate the gas tank?

A. Yes.

Q. I believe you testified to that before too, haven't you, sir?

A. Yes.

Q. And that would be, as I understand it, to put the gas tank somewhere towards the rear of the motorcycle; is that a fair statement?

A. Under the seat.

Q. Under the seat?

A. Yes. It's not on the back end, but rather under the seat. [Peterson Dep., p. 145].

\*   \*   \*   \*   \*   \*

Q. So on the third alternative, as I understand it, and you stop me if I am wrong, is that there should be a crash worthy vehicle, I'll call it, mandated and produced? Am I on the right track? Help me here.

A. No, I wouldn't call it a third.

Q. Which one would you call it?

A. I would call it really the first. There's one—what I have proposed is that the U.S. Department of Transportation promulgate safety standards for a two-wheeled vehicle, to make that two-wheeled vehicle as crash worthy as it is feasible to make it. [Peterson Dep, p. 159].

However, Plaintiffs have proffered no evidence as to the magnitude of the risks involved with Kawasaki's 750 Spectra, or Kawasaki motorcycles in general, or even motorcycles as a class of vehicles. Plaintiffs have also failed to present any evidence demonstrating the feasibility of these alternative designs.

### i. magnitude of the risks

First, with regard to the magnitude of the risks, Plaintiffs in the instant case have not presented any evidence to indicate that the type of injury sustained was foreseeable. Instead, at oral argument, the Plaintiff implied that the Court could take judicial notice, of a "common knowledge" variety, of the number of motorcycle accidents that result in burn injuries. However, this is not so commonly known as to be appropriately noticed.

Even if the Court were to take judicial notice of the magnitude of the risk, i.e. that a great many motorcycle accidents result in fuel leakage and burn injuries, this alone would not be sufficient. In order to calculate the magnitude of the risks, the Court would have to be informed of the number of risks within a particular time frame (e.g. the total number of fires caused by fuel leakage in motorcycle accidents within one year) and the corresponding number of motorcycle accidents that did not result in fuel leakage and burn injuries in order to determine the relative risk. Absent any information about such figures, it is impossible to determine—or even to make an intelligent statement concerning—*how likely* the injuries were to occur.[1] Thus, the magnitude of the risks remains "quite uncertain," as it is contingent upon the unknown number of motorcycle fires caused by fuel leakage and the unknown number of motorcycle accidents not resulting in fuel leakage. *Owens,* 414 Mich. at 430, 326 N.W.2d 372. Under these circumstances Michigan law dictates that, "an examination of the effects of any proposed alternative design must bear a *heavy burden* in determining whether the chosen design was unreasonably dangerous." *Owens,* 414 Mich. at 430, 326 N.W.2d 372 (emphasis added). Of course, if the Plaintiff had shown any evidence as to risk of injury, the requisite show-

---

1. "Likelihood" is neither more nor less than "probability," and probability can be computed. The probability that an event will occur is the ratio of the number of outcomes in an exhaustive set of equally likely outcomes that produce a given event to the total number of outcomes. Webster's New Collegiate Dictionary 937 (9th ed.

1983). For example, when a six-sided die is rolled, the probability that a "three" will come up is 0.16: 1 chance in 6. In the instant case plaintiffs have presented no data on the total number of possible outcomes. Without knowing the denominator, it is impossible to determine the "ratio," i.e. the probability.

ing as to likelihood of injury would be inversely proportionate to the gravity of the potential harm. "As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." *Prosser and Keeton on Torts,* § 31, p. 171 (5th ed. 1984).

### ii. feasibility of the alternatives

██ In formulating a meaningful application of the "heavy burden" requirement set forth by the *Owens* court, it is important to keep in mind the potential dangers that led to that court's determination. The stringent standard formulated by the *Owens* court evinces Michigan's desire to avoid the abuses that could occur in design defect cases were a lesser showing required. Under *Owens,* a party would be unable to create a question of fact as to the unreasonableness of a product's design simply by producing a pedigreed expert who would testify that, although it is not in use,[2] he or she has invented a type of "safety device" or an alternative design which would very likely produce a high degree of success in making the product safer. Allowing a plaintiff to present and argue such scant evidence to a jury would violate one of the fundamental precepts of *Owens* by leading the trier of fact into a "web" from which no principled decision would be possible. *Owens,* 414 Mich. at 428, 326 N.W.2d 372. Thus, in a case where the magnitude of the risks is uncertain—and the proposed alternative design is not in use—the mere assertion by an expert that a proposed alternative would have been "safer" is insufficient to create a question of fact as to whether or not the chosen design was "defective." A plaintiff who proffers an alternative design that is not currently in use must do significantly more to make out a prima facie case under the "heavy burden" standard of *Owens. See* Ernest R. Bazzana et al., *Owens v. Allis–Chalmers: The Standard of Proof in a De-*

*sign Defect Case,* Michigan Bar Journal, Feb. 1990, at 167.

██ To satisfy the "heavy burden" created by *Owens* under such circumstances, this Court holds that it is incumbent upon a plaintiff to make a showing—via compelling, empirical evidence of an alternative design—that the chosen design was unreasonably dangerous. Such empirical evidence will probably most often take the form of testing, but must objectively show acceptability, utility, feasibility (including cost), and general safety of the proposed alternative design vis-a-vis the allegedly defective design. It is only with the assistance of such evidence on the proposed alternative design that the trier of fact can make a sound determination as to whether or not the product in question was "defectively designed," i.e. whether the manufacturer exercised reasonable care in making the design choices it made.

At oral argument, Plaintiffs' Counsel represented that previously unsubmitted portions of Dr. Peterson's deposition contained testimony regarding the issue of feasibility. However, the Court has reviewed the portions cited by Plaintiffs' Counsel, specifically, pages 141–155 (as well as the entire deposition), and has not found any mention of evidence tending to show feasibility. Dr. Peterson describes the alternative designs but does not address how practicable the manufacture of these designs would be, nor does he discuss estimated costs of production of these alternative designs, etc. In short, Dr. Peterson says nothing about the feasibility of the proposed alternative designs.

The simple reference to alternative designs, without any evidence of the feasibility of these designs is not sufficient, as a matter of law, to invite the trier of fact to consider the alternatives and risks faced by Defendant Kawasaki at the time it manufactured the product in question and to determine whether, in light of these, it exercised reasonable

---

**2.** It is well settled that evidence that a proposed alternative design was available, reasonably efficient and safe is enough to create a question of fact as to whether the manufacturer exercised reasonable care in making the design choices it made. *See e.g. Foster v. Caterpillar Tractor Co.,* 714 F.2d 654 (6th. Cir.1983) (evidence that expert would testify that explosion-proof caps were available at the time defendant's allegedly defectively designed battery was manufactured enough to create a question of fact under *Owens* ); *Shapiro v. Cook United, Inc.,* 762 F.2d 49 (6th Cir. 1985) (evidence of alternative ladder pads that were available, reasonably efficient, and safe sufficient to satisfy *Owens* ).

care in making the design choices it made. *Prentis, supra*, 421 Mich. at 688, 365 N.W.2d 176. Plaintiffs in the instant case have not satisfied the "heavy burden" standard created by the Michigan Supreme Court in *Owens* because they have not produced compelling, empirical evidence of an alternative design that is feasible. Therefore, Plaintiffs have failed to present a prima facie case of "design defect."

Accordingly, Defendant's motion for summary judgment on Plaintiffs' design defect counts must be GRANTED. *See, Petto v. Raymond Corp.*, 171 Mich.App. 688, 694–695, 431 N.W.2d 44 (1988) (affirming the trial court's directed verdict where plaintiff had failed to introduce evidence of frequency or foreseeability of accidents and failed to provide evidence regarding the suitability of alternative designs), citing *Owens*, 414 Mich. at 429, 431, 432, 326 N.W.2d 372; *Siminski v. Klein Tools, Inc.*, 840 F.2d 356, 358 (6th Cir.1988) (directed verdict appropriate where only evidence offered by plaintiff was plaintiff's own testimony that a wider belt would have spread the force of the fall).

### B. Failure to warn

Defendants move for summary judgment on all claims;[3] however, the parties do not separately argue failure to warn in their briefs. In order to properly dispose of the case, the Court will address the issue. Furthermore, since resolution of this claim requires a different analysis, it will be addressed separately.

The elements of a claim for failure to warn are as follows:

A duty is imposed on a manufacturer or seller to warn under negligence principles summarized in § 388 of 2 Restatement Torts, 2d, pp. 300–310. Basically, the manufacturer or seller must (a) have actual or constructive knowledge of the claimed danger, (b) have 'no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition,' and (c) 'fail to exercise reasonable care to inform [users] of its dangerous condition or of the facts which make it likely to be dangerous.' *Glittenberg v. Doughboy Recreational In-*

*dustries*, 441 Mich. 379, 389–390, 491 N.W.2d 208 (1992).

Of course, the other elements of a negligence action require not only a breach of a duty, but also causation and damages. The question of duty to warn need not be addressed where causation is lacking. Under the instant facts, failure to warn Plaintiff was not the cause of his injuries:

[Plaintiff] contends that he was entitled to a jury instruction that defendants might be found liable for breach of a duty to provide a warning of the hazard of ignition of gasoline spraying onto the clothing of the motorcycle operator in the event of a collision. Plaintiff does not specify a proximate cause relationship between the lack of a warning and the burns suffered by him. Nor was any such relationship established in our view. The trial record is barren of any evidence that a warning would have made the fuel system safer or enabled plaintiff to do anything to prevent his burns other than to avoid a high-speed crash, a mishap involving grave danger of which he had knowledge without a warning. *Height v. Kawasaki Heavy Industries, Ltd.*, 190 N.J.Super. 7, 9–10; 461 A.2d 757 (1983).

The same is true in any like case. The problem that Plaintiffs allege is a defect in the fuel system. A warning would not cure the defect, nor would a warning allow the Plaintiff to take any corrective measure against the problem of fuel leakage and explosion. A warning would not motivate Plaintiff to avoid an accident, since an accident, especially one which, as here, involves an animal darting into the roadway, is something that is not planned. In other words, the presence of a warning would have no effect on the ensuing circumstances. *Height, supra.*

This conclusion is supported where, as here, there is no evidence of Kawasaki's knowledge of frequent problems associated with use of the fuel system, for instance, that consumers fill the fuel tank too full, or any other problem that a warning could help cure. *Compare, O'Donnell, supra*, 696 P.2d

---

**3.** Defendants' brief in support of the motion for summary judgment, page 1.

at 1287 ("Appellant's expert testified further that ... Suzuki had knowledge of the fire hazards associated with motorcycle accidents and failed to warn users against filling the fuel tank to capacity.... [creating] a question of fact").

Plaintiffs cannot show that a failure to warn caused the plaintiff's injuries. Accordingly, Defendant's Motion for Summary Judgment is also GRANTED with respect to Plaintiffs claim for failure to warn.

### C. Other issues

The Court expressly declines to rely on Defendants' arguments that summary judgment in their favor is compelled because: (1) the product is missing; (2) the alternative designs are not in use; and (3) the product as designed did not violate any then existing (or even currently existing) industry standards. The Court will take this opportunity to briefly address its hesitance to rely on these purported grounds for summary judgment.

#### i. missing product

##### a. identity of gas cap

■ Defendant's first argument is that summary judgment is warranted because of a dispute as to whether the gas cap in place at the time of the accident was the manufacturer's cap. Plaintiff testified at a deposition that "I bought it [the motorcycle] brand new. It was never sold before I bought it. It was brand new. It was still in the case or whatever." (Fisher Dep., p. 38). Plaintiff also stated that he has never replaced the gas cap. (*Id.* at 47).

When asked to describe the gas cap, Plaintiff testified that the gas cap was "chrome" and when asked if it was "shiny like chrome?," Plaintiff replied, "yes." (*Id.* at 46). However, the only cap manufactured and sold with the Kawasaki 750 Spectra motorcycle is black. (Elliot affidavit). Plaintiff's expert acknowledged that the model of motorcycle that Plaintiff owned was not manufactured with a chrome cap. (Peterson

Dep., p. 79). On the other hand, Plaintiff's expert noted that the manufacturer's cap "has a black color to the metal. How they do that I am not sure, but it's a shiny black cap." (*Id.* at 27).

Defendant places much importance on this discrepancy; however, this merely creates a "genuine issue of material fact whether the modifications were an intervening cause 'which actively operate[d] in producing harm to another after the actor's negligent act or omission ha[d] been committed.'" *Colman v. Gatto Machinery Development Corp.*, 793 F.Supp. 749, 753 (E.D.Mich.1992) (possible modifications were the removal of rollers at the mouth of a cat-a-puller manufactured by defendant). Therefore, this contention will not provide a ground for summary judgment.

This result is not altered by *Cousineau v. Ford Motor Co.*, 140 Mich.App. 19, 363 N.W.2d 721 (1985). Defendants rely on *Cousineau* for the proposition that summary judgment must be granted in their favor for plaintiff's failure to identify the product, citing to testimony concerning the gas cap. However, in *Cousineau*, the plaintiff was utterly unable to identify the manufacturer of the product (wheel) at issue. *Id.* at 25, 363 N.W.2d 721; *see also, Nicholaou v. Yamaha Motor Corp.*, 645 F.Supp. 227 (E.D.Mich. 1986) (granting defendant's motion for summary judgment where plaintiff could not identify the model or year of the unavailable product that caused plaintiff's injuries).

Although the identity of the manufacturer of the gas cap may be at issue in the instant case, the identity of the manufacturer of the fuel system of the motorcycle is not. Therefore, considering plaintiff's amended complaint which alleges that the entire fuel system is defective, Defendants' reliance on *Cousineau* is not well placed.

##### b. unavailability of subject fuel system

■ Setting aside the problem with identity of the gas cap, Defendants request summary judgment because the instant motorcycle's fuel system has not been preserved.[4]

---

4. The motorcycle was taken to a scrap yard where all of the parts of the fuel system were removed for unknown reasons and by an unknown person or persons. Pl.Resp.Br., p. 4.

Defendants contend that the circumstances surrounding the disappearance of the parts were suspicious. Def.Br., p. 4. They are, at the least,

**474**

Although Plaintiff admits that its burden is made more difficult to ascertain because of the loss, Plaintiff argues that his difficulty does not relieve defendant of liability.

°Since in design defect cases, the focus is on the entire line of products (750 Spectra Kawasaki motorcycles), loss of the particular motorcycle in question would not appear significant. *O'Donnell v. Casper,* 696 P.2d 1278, 1287 (Wyo.1985). In *O'Donnell,* the Court allowed the design defect case to proceed to the jury where the fuel system of a motorcycle was never recovered after the accident and explosion. The Court in *O'Donnell* relied on the proposition that the subject vehicle need not be introduced into evidence since circumstantial evidence can establish a defect. *Id.; see also, Pohlod v. General Motors Corp.,* 40 Mich.App. 583, 588, 199 N.W.2d 277 (1972). Furthermore, the design may still be readily examined for defects from Kawasaki's own documents evidencing the design.[5] Therefore, the unavailability of the instant fuel system is not a ground upon which to grant summary judgment in favor of Defendants.

### ii. alternative designs are not in use

■ Defendant also emphasizes that the proposed alternative designs offered by Dr. Peterson have never been utilized. However, this alone would not appear to be sufficient to warrant summary judgment in favor of defendant. Instead, the fact that the alternative designs are not in use would be a factor in determining feasibility of these proposed alternative designs. *O'Donnell, supra,* 696 P.2d at 1287–1288 (reversing lower court's determination that because Dr. Peterson's designs were not in use, summary judgment was compelled). Accordingly, summary judgment is not granted on this ground.

subject to some interesting questions about motivation.

5. It is undisputed that plaintiff was operating a 750 Spectra Kawasaki motorcycle.

6. In *Allen,* the industry standards had changed after the product at issue had been manufactured; as noted earlier, in the instant case, there simply are no applicable industry standards, past or present.

### iii. industry standards

■ Plaintiff's expert notes that the design of the 750 Spectra did not violate any industry or governmental standards or regulations in force at the time of design or even in force today:

Q. ... it did not violate any United States regulations or standards, did it, sir, its design?

A. I am not aware of any that it did.

Q. Nor, to the best of your knowledge, did it violate any state standards, Michigan state standards?

A. True.

Q. Or industry standards?

A. True. I don't know that it violated. In fact, I don't know of any that exist. [Peterson Dep, p. 158].

Defendants contend that summary judgment is proper where the motorcycle in question, as designed, did not violate any then existing or current industry standards, citing *Allen v. Verson Allsteel Press,* 957 F.2d 275, 276–277 (6th Cir.1992). However, *Allen, supra,* does not stand for the proposition that compliance with industry standards alone renders summary judgment in favor of defendant warranted. Instead, *Allen,* held that where plaintiffs did not present evidence of violation of then existing industry standards,[6] plaintiff's assertion that the press was defective because it violated industry standards was not supported.[7]

Furthermore, Michigan courts do not hold that compliance with industry standards equates with a finding that the product was reasonably designed. For instance, in *Kinzie, supra,* 167 Mich.App. at 535, 423 N.W.2d 253, the Court affirmed the trial court's denial of a directed verdict motion even though plaintiff's expert "did concede that he knew

7. The Court in *Allen* relied upon two additional grounds to support the trial court's grant of summary judgment in favor of defendant manufacturer; thus, the Court did not hold that compliance with industry standards alone would support summary judgment in favor of defendant manufacturer.

of no lawn mower manufacturer using a non-vented cap. Nonetheless, it is an established fact that gasoline did leak and did ignite causing the injuries." In addition the Court in *Owens*, 414 Mich at 427, 326 N.W.2d 372, found that the Court of Appeals had improperly limited design defect inquiry to whether the manufacturer had complied with governmental or industrial standards or had failed to warn of a latent defect.

Thus, summary judgment is not granted based on the fact that the design did not violate any then existing industry standards. *See, Owens, supra.*

### IV. Conclusion

Plaintiff Victor Fisher has failed to present evidence to defeat the Defendants' properly supported motion for summary judgment with regard to the first four counts [8] in the complaint; therefore, summary judgment must be granted in favor of Defendants as a matter of law. *Street, supra*, 886 F.2d at 1479. Since Plaintiff Nancy Fisher's claim (Count V) depends on the survival of Plaintiff Victor Fisher's claims, Plaintiff Nancy Fisher's claim for loss of consortium must also fail.

Defendants' motion for summary judgment is GRANTED as to all claims put forward by Plaintiffs.

Accordingly, this case is DISMISSED.

IT IS SO ORDERED.

---

[8]. Plaintiffs' breach of implied warranty claim (Count II) is treated the same as plaintiff's negligent design claim since Plaintiff argues design defect under both topics. *Prentis, supra*, 421 Mich. at 691, 365 N.W.2d 176. Furthermore, liability under Mich.Comp.Laws § 600.2945 (Count III), is analyzed in the same manner as the common law products liability claim because the statute "does not create a cause of action, ... [it] presupposes the existence of a 'theory of liability' ... [and it] does not in any way change the common law elements" *Lewin v. McCreight*, 655 F.Supp. 282, 283 (E.D.Mich.1987).