**Joe T. ELDRIDGE and Kelly Eldridge, Plaintiffs,**

v.

**CRANE VALVE COMPANY, Defendant.**

No. 1:94–CV–314.

United States District Court,
W.D. Michigan,
Southern Division.

April 9, 1996.

Robert F. Hunt, Frey, Hunt, Hassler & Lorenz, Terre Haute, IN, for plaintiffs.

Gary L. Stec, Harvey, Kruse, Westen & Milan, P.C., Grand Rapids, MI, for defendant.

## OPINION

QUIST, District Judge.

This is a civil action in tort wherein plaintiffs Joe and Kelly Eldridge allege that defendant, Crane Valve Company, is liable for the injuries, future medical expenses, mental distress, and loss of consortium suffered because a plug valve of defendant's design broke and struck Mr. Eldridge in the face. This matter is before the Court on defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

### Facts

The accident took place at the factory of Engine Power Components, Inc. in Grand Haven, Michigan. Prior to 1984, the factory was operated by Cooper Industries, a conglomerate that had previously bought out a company named Gardner, Denver and Copper. The factory uses a compressed air line system as the main power supply to its machinery. On January 29, 1993, after they had repaired a leak in an air supply system to the dryer unit, Mr. Eldridge and three other maintenance workers were in the process of diverting the flow of pressurized air back through the dryer unit. While the other crew members moved the second of two valve plugs with a large wrench, Mr. Eldridge watched the valve's "hash mark" indicators to determine when the valve was properly turned. At this time, the valve fractured internally and a piece of the valve was ejected from the valve. The piece struck plaintiff in the face, thereby causing his injuries. The valve was designed and manufactured by defendant. In their Complaint, plaintiffs alleged that the valve was defectively designed. The parties and this Court agree that the law of the state of Michigan is applicable in this case.

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the nonmoving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. The summary judgment standard mirrors the standard for a directed verdict. The only difference between the two is procedural. Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511.

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but the court may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

# I.  Presenting a Prima Facie Case

Under Michigan tort law, a manufacturer has a duty to design its product so as to eliminate any unreasonable risk of foreseeable injury. *Prentis v. Yale Mfg. Co.,* 421 Mich. 670, 693, 365 N.W.2d 176 (1984); *Owens v. Allis–Chalmers Corp.,* 414 Mich. 413, 425, 326 N.W.2d 372 (1982). Michigan has adopted a "pure negligence, risk-utility test" for determining whether a manufacturer can be held liable for injuries caused by defectively designed products. *Prentis,* 421 Mich. at 691, 365 N.W.2d 176. A finding that defendant is liable for its product is "the equivalent of a determination that an entire product line is defective." *Prentis,* 421 Mich. at 690, 365 N.W.2d 176. Because defendant does not dispute that it designed and manufactured the valve in question, the alleged defect is attributable to defendant. In order to present a prima facie case, plaintiff must therefore bring forth evidence showing that the design was unreasonable when made.

In evaluating the reasonableness of a manufacturer's design decision, the court must consider two factors:

(1) the magnitude of the risks of injury involved, including the likelihood of the occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident and

(2) the reasonableness of the proposed alternative design and whether that device would have been effective as a reasonable means of minimizing the foreseeable risk of danger.

*Fisher v. Kawasaki Heavy Indus., Ltd.,* 854 F.Supp. 467, 469 (E.D.Mich.1994) (citing *Reeves v. Cincinnati, Inc.,* 176 Mich.App. 181, 187–88, 439 N.W.2d 326 (1989)). To prove a design defect, a plaintiff must produce sufficient evidence concerning these factors. "Absent such evidence, a plaintiff has not presented a prima facie case and the defendant manufacturer is entitled to judgment as a matter of law." *Fisher,* 854 F.Supp. at 469.

## II. Magnitude of the Risks

■ Under this factor, plaintiffs must present evidence that the type of injury suffered was foreseeable. *Fisher*, 854 F.Supp. at 470. In the instant case, plaintiffs have shown that defendant foresaw that certain people would be likely to exert too much pressure or torque on the valve. Defendant distributed a warning on wrenches, named "helpful hints on handing piping materials," which stated as follows:

too much leverage is dangerous

Avoid bearing down on the joint with an oversize wrench or a wrench with an extension handle. It often gives you more leverage than you need, and may result in pulling up a joint so tight that the fitting will be cracked, the valve twisted out of shape, or the pipe run clear into the seats.

(Defendant's Reply Brief, Exhibit 1.)

While this warning does not by itself indicate that defendant foresaw the type of accident which befell Mr. Eldridge, it does indicate that defendant was aware that over-torquing could physically damage the valves. Defendant has conceded that one could infer from the testimony of Dr. James Eifert that the accident was foreseeable. (Defendant's Brief, docket # 29, at 12.) Furthermore, while a number of experts testified that there was no evidence that another three-way plug valve had caused a similar accident, they also testified that, in general, it was foreseeable that a flying fragment from an overtorqued pressurized valve could injure someone. (*See, e.g.,* McLean Dep. at 38–39; Koester Dep. at 15–16.) As a result, this Court finds that plaintiffs have submitted sufficient evidence to support the proposition that the type of accident which occurred was foreseeable when the valve in question was made, and that a risk was therefore present.

■ In order to accurately calculate the magnitude of the risk, the Court must be able to determine the frequency with which the specific type of accident is likely to occur. *Owens*, 414 Mich. at 430, 326 N.W.2d 372. For example, if the type of injury suffered was minor, there must be a high incidence of occurrence in order for the magnitude of the risk to be substantial. Similarly, "[a]s the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution." *Fisher*, 854 F.Supp. at 471 (quoting *Prosser & Keeton on Torts*, § 31, at 171 (5th ed. 1984)). The incidence of injury is determined by comparing the number of risks within a particular time frame with the number of times the specific type of injury occurs. Absent *any* information on the incidence of the injury, "it is impossible to determine—or even to make an intelligent statement concerning—how likely the injuries were to occur." *Id.* at 470. In the instant case, there is no evidence that a similar type of injury has ever occurred as a result of over-torquing this particular kind of valve. (McLean Dep. at 39; Koester Dep. at 16, 28, 31.) Moreover, there is no evidence of a similar type of failure of this particular kind of valve. (McLean Dep. at 13; Koester Dep. at 14–15.) As a result, it is impossible to calculate the magnitude of the risk with any degree of confidence.

The Michigan Supreme Court has held that "where the magnitude of the risks is quite uncertain because it is dependent upon the unknown incidence of [the specific injury in question], an examination of the effects of any proposed alternative design must bear a *heavy burden* in determining whether the chosen design was unreasonably dangerous." *Owens*, 414 Mich. at 430, 326 N.W.2d 372 (emphasis added).

## III. Alternate Designs

■ The Sixth Circuit has held that plaintiff "may avoid a directed verdict under *Owens* by offering proof that [1] the alternatives were in use at the time the defective product was manufactured *and* [2] by presenting expert testimony that the alternatives were reasonable." *Phillips v. Hardware Wholesalers, Inc.*, 762 F.2d 46, 48 (6th Cir.1985) (emphasis added); *see also Foster v. Caterpillar Tractor Co.*, 714 F.2d 654, 655–57 (6th Cir.1983).[1] Without evidence that the pro-

---

1. As stated earlier, the summary judgment standard mirrors the standard for a directed verdict; the only difference between the two is procedural. Summary judgment is made based on docu-

posed alternate design was feasible, the trier of fact cannot determine whether the manufacturer exercised reasonable care in choosing the design it ultimately marketed. *Fisher*, 854 F.Supp. at 471.

In the instant case, defendant contends that proposed safety features were not "in use" because the valves which incorporated the safety feature [2] advocated by plaintiffs were as different from the allegedly defective valve, a three-way valve, as apples are from oranges. This Court disagrees with defendant's distinction. In *Phillips*, the safety feature at issue was the "feet" (or pads) at the bottom of ladders. *Phillips*, 762 F.2d at 47. The expert, Frank Kleeman, in *Phillips* "gave testimony regarding alternatives to the pads on the . . . ladder. He stated that pads could be made with silicone carbide or aluminum oxide abrasives, such as are used in stairways. According to Kleeman, the development of such a pad was feasible from an engineering standpoint." *Id.* The *Phillips* court held that this evidence was sufficient to demonstrate that the alternate technology was available. *Id.* at 49.

■ Defendant also contends that plaintiffs have offered no proof that alternate designs were actually in use when the valve in question was purchased by Gardner, Denver and Copper. Plaintiffs offer evidence of usage of alternate designs as of the September 1972 edition of the Cast Iron Plug Valves Standard Practice Guide ("Practice Guide"). As evidence that the valve in question was purchased after September of 1972, plaintiffs offer the deposition testimony of Henry Klukas, Sr., a maintenance foreman at Gardner, Denver and Copper beginning in 1966, and an employee of Cooper Industries after it acquired Gardner Denver. When asked if he had indicated earlier that "sometime after 1966 and before the early 1970's these [allegedly defective] valves would have been placed in service," Mr. Klukas stated, "Right." (Klukas Dep. at 9.) Mr. Klukas also indicated that nobody would know better than he when the valve in question was actually placed into service. (Klukas Dep. at 9–10.)

The testimony of Mr. Klukas is ambiguous with respect to the precise date the valve in question was purchased. As a general rule, ambiguities and conflicts in deponent's testimony in matters submitted for summary judgment are matters for fact-finder to sort out. *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 433 (3d Cir.1996) (citing *Wilson v. Westinghouse Elec. Corp.*, 838 F.2d 286, 289 (8th Cir.1988)). Thus, this Court holds that this evidence is sufficient to allow a reasonable jury to find that the alternate design advocated by plaintiffs' expert, Gary Hutter, was "in use" when the allegedly defective valve was sold. Plaintiffs have therefore satisfied the first requirement under *Phillips*, that "alternatives were in use at the time." *Phillips*, 762 F.2d at 48.

Concerning the second *Phillips* requirement—that plaintiffs present expert testimony showing that the alternatives were reasonable—plaintiffs have deposed at least one expert, Mr. Hutter, who will testify that alternative designs incorporating beneficial safety features were both technologically available and reasonable when the valve in question was sold. Hutter testified that "there is nothing in the design philosophy or nothing in their application that would have prevented the same technology or design configuration to be used in a three-way valve." (Hutter Dep. at 61.) Evidence that the safety devices were utilized in valves other than three-way valves is sufficient evidence of economic feasibility to survive a motion for summary judgment. Thus, plaintiffs have satisfied the "heavy burden" imposed by *Owens*. An Order consistent with this Opinion will be entered.

■

---

mentary evidence before trial, and directed verdict is made based on evidence submitted at trial. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511.

**2.** A "blow-out stem."